# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| CONTRACT TRANSPORT SERVICES, INC. | CASE NO. _____ |
| And | JUDGE _____ |
| WILLIAM MADACHIK, | |
| Plaintiffs. | |
| v. | |
| NEW ERA LENDING LLC | |
| And | |
| COLLINS CASH, INC. dba SMART BUSINESS FUNDING | |
| And | |
| SMART BUSINESS FUNDING | |
| And | |
| DMKA LLC dba THE SMARTER MERCHANT | |
| And | |
| MERCHANT CASH AND CAPITAL LLC dba BIZFI FUNDING dba BIZFI | |
| And | |
| PEARL BETA FUNDING, LLC dba PEARL CAPITAL | |
| And | |
| BANKERS NETWORK SERVICES, LLC | |

And

KRISTOPHER SWEED,

Defendants.

## COMPLAINT

Plaintiffs Contract Transport Services, Inc. and William Madachik (collectively, "CTS"), through their undersigned attorney, allege:

## NATURE OF THE ACTION

1.      In recent years, since the recession which began in 2008, non-traditional or alternative lenders providing consumer and corporate borrowers with short-term, high cost loans sprang into being providing cash flow to individuals and small companies not being served by traditional banks.  These lenders offer quick cash loans in exchange for high fees and interest.  This form of **consumer** loan is referred to as a "payday loan" or "title loan".  The **corporate** form of an alternative loan is referred to as a "merchant loan" or "merchant cash advance", sometimes referred to in the industry as "MCA".  Most merchant lenders, including the Defendants in this case, charge criminally usurious interest rates.

2.      In this case, Defendants, except Bankers Network Services, LLC and Kristopher Sweed, are merchant lenders that provided merchant loans or merchant cash advances to Plaintiff Contract Transport Services, Inc. ("CTS") which were guaranteed by Plaintiff William Madachik.

3.      Defendant Bankers Network Services, LLC and Kristopher Sweed acted as brokers and/or agents for certain Defendants.

4.      Whereas payday loan lenders operate out of storefronts, merchant lenders operate through the Internet, with website, email, and telephone communications.  They also communicate through direct mail and social media (*i.e.*, Facebook.com).

2

5.     Banks are highly regulated by the government.  However, merchant lenders are not regulated by laws that govern banks.

6.     Typically, merchant lenders deceive their borrowers with misinformation provided on the merchant lenders' websites, electronic mails, and other communications and writings.  They call themselves "lenders" or banks and state that they provide financing and/or "loans".  Their websites provide testimonials referring to loans that helped other businesses and the easy and quick loan process.  However, the contracts used by merchant lenders consistently include detailed provisions meant to evade usury laws providing that the transaction is not a loan despite the fact that the agreement will also contain elements ordinary to loans – namely, repayment terms.  Sales do not include repayment terms.

7.     Generally, a merchant loan agreement will provide that the transaction is a sale of future receivables.  For example, the agreement will provide a "Purchase Price" of $75,000, a "Purchase Amount" of $107,250, a "Specified Percentage" of 25%, and a "Fixed Daily Amount" of $893.75.  The Purchase Price (always the smaller amount) is the amount of money that will be loaned to the borrower.  The Purchase Amount is the amount that the borrower will repay to the lender.  The Specified Percentage is the percentage of daily receivables that the borrower is supposed to forward to the lender – this number actually never plays any role in the transaction. The Fixed Daily Amount is the amount that is to be paid to the lender every business day regardless of the amount of receivables collected by the borrower on any given day.

8.     The cost to a borrower receiving money from a merchant lender is significant.  An "Origination Fee" of $2,250 may be charged, along with other fees for ACH payment transfers ($50), insufficient funds fee ($25 each), rejected ACH ($100), charge for changing bank accounts

($50), and default fee of $2,500.  Legitimate sales do not generally include these types of fees, but loans do.

9.      Payments to repay the loans are typically made daily, Monday through Friday, via ACH transfer, an automatic method for transferring funds between bank accounts.

10.     If the merchant loan were really a sale of future receivables, then the buyer would have no recourse against the seller; the buyer would buy the receivables and proceeds collected from such receivables would be forwarded to the buyer.  If proceeds from the receivables did not provide the buyer with a sufficient amount to cover the amount the buyer paid for the receivables, then the buyer would take a loss.

11.     In contrast, these purported sales of future receivables are not really sales at all. Instead, the borrower (seller) is required to sign a personal guaranty.  If insufficient amounts are collected from the receivables, then the guarantor must pay the difference.   Amounts are transferred out of the borrower's (seller's) bank account and paid to the lender (buyer) regardless of whether such amounts are receivables proceeds.  If insufficient amounts are collected from receivables, then the lender (buyer) files a confession of judgment document with a New York court – a confession of judgment that was executed at the same time that the original merchant loan agreement was finalized.

12.     In this case, the Defendant merchant lenders required Plaintiffs to execute confessions of judgment at the outset when signing the promissory note agreement for each loan, in violation of Ohio law.  Ohio Revised Code section 2323.13(D) provides that a confession of judgment in any promissory note, executed on or after January 1, 1974, "is invalid and the courts are without authority to render a judgment" unless certain very specific statutory language appears directly above or below the signature area "in such type size or distinctive marking that it appears

more clearly and conspicuously than anything else on the document". None of the agreements at issue in this case contains the language required by Ohio Revised Code section 2323.13(D), which is commonly referred to as "cognovit" language.

13.     Simply stated, if the transaction was really a sale, then the seller would not need to re-pay the sale amount and there would be no purpose for having a confession of judgment.

14.     In this case, the merchant lender Defendants required Plaintiffs to re-pay funds that were loaned to them along with criminally usurious interest.

15.     For twenty (20) years, CTS has operated as a passenger transportation company. CTS transports primarily elderly and handicapped people to doctors' appointments.

16.     Changes in Medicare and Medicaid payment policies suddenly and dramatically reduced CTS' cash flow in the past several years. Fifty dollars per hour is paid by Medicare for transportation; the same trip, when paid by Medicaid, is paid at twenty dollars per hour. In recent years, governmental policy changes moved certain transport services which were previously paid by Medicare to Medicaid, thereby immediately and dramatically reducing the amounts received by CTS from most of its customers.

17.     All of the Defendant Merchant Lenders deceived CTS with misinformation on their websites and in their electronic and oral communications.

18.     Because all of the loans involving the merchant lenders named as Defendants in this case included within their respective agreements interest in excess of Ohio and New York criminal usury amounts, which are set at 25% interest per year for loans involving businesses, all of the Defendant merchant lenders charged criminally usurious amounts of interest in all of the loan transactions at issue.

19.     All of the Defendant merchant lender agreements in this case are illegal contracts and are therefore unenforceable.

## THE PARTIES

20.     Plaintiff CTS is a corporation organized under the laws of the State of Ohio with its principal office located at 3223 Perkins Avenue, Cleveland, Ohio 44114.

21.     Plaintiff William Madachik resides at 7643 Edgewood Lane, Seven Hills, Ohio 44131.

22.     Defendant New Era Lending LLC ("New Era Lending") is a limited liability company organized under the laws of the State of Delaware, and registered to do business in New York, having an address at 762 North Orange Street, Wilmington, Delaware 19801.

23.     Defendant New Era Lending's statutory agent in Delaware is Americhoice Incorporators Ltd., 1201 N. Orange St., Ste. 762, One Commerce Center, Wilmington, DE 19801 and in New York is New Era Lending LLC, Attention Alan Karul, Chief Financial Officer, 2371 McDonald Avenue, Brooklyn, New York 11223.

24.     Defendant New Era Lending is not registered to do business in the State of Ohio.

25.     In an electronic mail communication dated October 28, 2016 Smart Business Funding is identified as a subsidiary of Defendant New Era Lending by its Chief Executive Officer, Anthony Collin.  *See* Exhibit A.

26.     Smart Business Funding's Better Business Bureau Listing provides that its alternate name is Collins Cash Inc.  *See* Exhibit B.

27.     Defendant Collins Cash Inc. dba Smart Business Funding ("Collins Cash") is registered to do business in the State of New York.

28.     Collins Cash Inc. is not registered to do business in the State of Ohio.

29.     Defendant Smart Business Funding is not organized nor is it registered to do business under the laws of Delaware, New York, or Ohio.

30.     Defendant Smart Business Funding's website lists its address as 601 Ocean Parkway, #8E, Brooklyn, New York 11218.

31.     Collins Cash's New York registration lists its address for service of process as 2362 Nostrand Avenue, Apt. 2, Brooklyn, New York 11210.

32.     Defendant DMKA LLC dba The Smarter Merchant ("Smarter Merchant") is a limited liability company organized under the laws of the State of New York with its principal place of business located at 1115 Broadway, 11th Floor, New York, New York 10010.

33.     Smarter Merchant's statutory notice address is DMKA LL, 415 W. 23rd Street, 10F, New York, New York 10011.

34.     Smarter Merchant is not registered to do business in the State of Ohio.

35.     Defendant Merchant Cash and Capital, LLC dba Bizfi Funding dba Bizfi ("Bizfi") is a limited liability company entity organized under the laws of the State of Delaware, registered to do business in the State of New York, with its principal place of business located at 460 Park Avenue, 10th Floor, New York, New York 10016.

36.     Defendant Bizfi's statutory address is Merchant Cash and Capital, LLC, 450 Park Avenue, South, 11th Floor, New York, New York 10016.

37.     Defendant Bizfi is not registered to do business in the State of Ohio.

38.     Defendant Pearl Beta Funding, LLC ("Pearl Beta") is registered to do business as a foreign limited liability company in the State of New York.  In New York, Pearl Beta Funding, LLC's address for notice of service is 100 William Street, 9th Floor, New York, New York 10038.

39.     Defendant Pearl Beta is organized as a limited liability company in the State of Delaware.  In Delaware, its statutory agent is Corporation Service Company, 2711 Centerville Rd., Suite 400, Wilmington, DE 19808.

40.     Defendant Bankers Network Services, LLC ("Bankers Network") is a limited liability company organized under the laws of the State of Ohio, with its principal place of business located at 6551 Lockwood Boulevard, Suite 3, Boardman, Ohio 44512.  The statutory agent for Defendant Bankers Network Services, LLC is Jerry Sweed at 6551 Lockwood Avenue, Suite 3, Boardman, Ohio 44512.

41.     On information and belief, Kristopher Sweed is an individual resident within the State of Ohio who resides at 6551 Lockwood Avenue, Suite 3, Broadway, Ohio 44512.

## JURISDICTION AND VENUE

42.     Each Defendant is subject to personal jurisdiction of this Court under the Ohio Long-Arm Statute, Ohio Revised Code ("ORC") § 2307.382(A)(1), because each of the transactions at issue arose from the Defendants' transaction of business within Ohio.

43.     Personal jurisdiction is also proper under ORC § 2307.382(A)(3), because each directed its tortious conduct, by act or omission, within the State of Ohio.

44.     This Court also has original jurisdiction over this action based upon 28 U.S.C. § 1962.

45.     This Court has original jurisdiction over this action based upon 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants, except Bankers Network and Mr. Sweed, and the amount in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000).

46.     This Court has jurisdiction over this declaratory judgment action under 28 U.S.C. § 2201 *et seq.*

47.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the transactions at issue were negotiated, executed, and performed within this judicial district.

48.     Venue is also proper because Plaintiffs regularly conduct business and/or reside within this judicial district.

49.     This Court has subject matter jurisdiction under ORC §§ 2905.21-.22, which confers subject matter jurisdiction on Ohio courts to declare a criminally usurious loan transactions void, 4165.01 *et seq.*, giving Ohio courts jurisdiction over deceptive trade practices, and 1345.02 *et seq.*, providing Ohio courts with jurisdiction over unfair or deceptive acts or practices.

## FACTUAL BACKGROUND

50.     Each of the transactions involving each of the Defendants has similar material terms.

51.     Although the agreements documenting each transaction assert that the transaction involves the purchase by Defendants of CTS' future accounts receivables, each transaction, when viewed in its totality, is a collateralized guaranteed loan transaction.

52.     At all times, CTS considered these transactions to be short-term business loans.

53.     At no point, did CTS ever seek to sell an interest in its accounts receivable.

54.     Defendants' websites and electronic and oral communications disguise the true nature of the transaction.

55.     Defendants entered into these transactions with the intent to charge an interest rate in excess of the statutory annual limit for corporate loans of 25%.

56.     In connection with these loans, the following documents or similar documents were required to be executed:

      a.   Agreement;

      b.   Personal guaranty;

      c.   ACH authorization form; and

      d.   Affidavit of confession of judgment.

57.     CTS was not represented by counsel during any of these transactions.

58.     CTS was not aware of the criminal usury laws of Ohio or New York.

59.     Within the transaction documents, no specific information was included related to CTS' customers or otherwise related to the sale of accounts receivable (*i.e.,* no current lists of outstanding A/R with aging is included).

60.     Defendants did not contact any of CTS' customers to investigate or assess ability to pay.

61.     There was no effective transfer of ownership of the accounts receivables to Defendants during or after the sale process.

62.     There was no term in the transaction documents for notification of the account debtors of any assignment of the receivables.

63.     Plaintiffs never executed any asset purchase agreements or assignment agreements.

64.     Before, during, and after the Defendants transferred money to CTS, the receivables continued to be owned and collected by CTS.  None of the Defendants ever collected any of CTS' receivables directly.

65.     CTS understood that daily payment to the Defendants was a requirement of the transaction regardless of whether CTS had recovered receivables sufficient to cover the daily payment amount.

66.     If any of the Defendants' agreements contained a provision stating that reconciliation based on the actual accounts receivables would occur, this term was inserted into the agreements solely for the purpose of avoiding criminal usury laws.

67.     Defendants never actually reconciled CTS' accounts receivables.

### THE LOAN AGREEMENTS

**New Era Lending Agreement – May 16, 2016**

68.     CTS entered into an agreement and transaction with Defendant New Era Lending on May 16, 2016, which purported to be a cash advance for purchase of CTS' proceeds from future sales by CTS, wherein New Era Lending transferred approximately $63,002 to CTS in exchange for CTS' agreement to pay $736 via ACH transfer from its bank account on every business day until approximately $94,984 was paid by CTS.  *See* Exhibit C.

69.     Mr. Madachik guaranteed the May 16, 2016 New Era Lending loan.

70.     CTS re-paid $64,032 to New Era Lending as of September 20, 2016.  *See* Exhibit C.

71.     Between May 16, 2016 and September 20, 2016, the effective rate of interest paid by CTS to New Era Lending related to the May 16, 2016 loan where $63,002 was borrowed and $94,984 was re-paid, was 51 percent interest over 4 months, for an effective interest rate of approximately 150 percent annually.

**New Era Lending Agreement – September 20, 2016**

72.     CTS entered into an agreement and transaction with Defendant New Era Lending on September 15, 2016, which purported to be a cash advance for purchase of CTS' proceeds from future sales by CTS, wherein New Era Lending transferred $110,000 to CTS in exchange for CTS' agreement to pay $1,390 via ACH transfer from its bank account on every business day until $152,900 was paid by CTS.  *See* Exhibit D.

73.     Mr. Madachik guaranteed the September 20, 2016 New Era Lending loan.

74.     Approximately $30,952 of the $110,000 borrowed by CTS was used to pay off the May 16, 2016 New Era Lending transaction.  *See* Exhibit D.

75.     Related to the September 20, 2016 loan, after fees and payment related to the previous loan were subtracted, New Era Lending advanced to CTS $79,048 on September 20, 2016.  *See* Exhibit C.

76.     On November 11, 2016, New Era Lending obtained entry of a Confession of Judgment related to the $152,900 re-payment amount to be paid by CTS as part of the September 15, 2016 transaction.  *See* Exhibit E.

77.     In the November 11, 2016 Confession of Judgment, New Era Lending obtained an order requiring an additional $32,317.50 in attorney's fees and $1,699.99 in additional interest which was not included within the Confession of Judgment executed by Mr. Madachik.  *See* Exhibit E.

78.     In the November 11, 2016 Confession of Judgment, New Era Lending submitted that it had been paid $23,630, when in fact as of October 12, 2016, New Era Lending had been paid $25,102.  *See* ExhibitS C, E.

79.     After entry of the Confession of Judgment, New Era Lending never domesticated the judgment in Ohio.  However, on November 25, 2016, New Era Lending was successful in garnishing CTS' Huntington bank account in the amount of $4,720.41.  *See* Exhibits C, F.

80.     CTS made payments to New Era Lending after entry of the Confession of Judgment and as of June 6, 2017, CTS had repaid New Era Lending $122,000 related to the September 20, 2016 transaction.

81.     Pursuant to the contract terms, if CTS pays the entire amount due in one year, as asserted by New Era Lending, CTS will have paid $154,599.99 toward the September 15, 2016 loan, which is approximately 41 percent interest over a period of one year, not including the attorney's fees of $32,317.50.

**New Era Lending Agreements – no legal counsel**

82.     CTS did not have advice from legal counsel on any of the agreements involving New Era Lending.

**Smarter Merchant Agreement – July 14, 2016**

83.     CTS entered into an agreement and transaction with Defendant Smarter Merchant on July 14, 2016, which purported to be a cash advance for purchase of CTS' proceeds from future sales by CTS, wherein Smarter Merchant transferred $75,000 to CTS in exchange for CTS' agreement to pay $893.75 via ACH transfer from its bank account on every business day until $107,250 was paid by CTS.  *See* Exhibit G.

84.     Mr. Madachik guaranteed the July 14, 2016 Smarter Merchant loan.  *See* Exhibit G.

85.    On December 14, 2016, Smarter Merchant obtained entry of a Confession of Judgment related to the $107,250 to be paid by CTS as part of the July 14, 2016 transaction.  *See* Exhibit H.

86.    In the December 14, 2016 Confession of Judgment, Smarter Merchant obtained an order requiring $4,549.77 in additional interest which was not included within the Confession of Judgment executed by William Madachik.  *See* Exhibit H.

87.    Smarter Merchant never domesticated the New York judgment in Ohio.  However, Smarter Merchant attempted to garnish CTS' bank accounts.

88.    CTS made payments to Smarter Merchant after entry of the Confession of Judgment and as of June 2, 2017, CTS had repaid Smarter Merchant $83,156.25 related to the July 14, 2016 transaction.  *See* Exhibit I.

89.    Pursuant to the contract terms, if CTS pays the entire amount due, as asserted by Smarter Merchant, CTS will have paid $111,799.77 toward the July 14, 2016 loan, which is effectively 49 percent interest over a period of one year.

**Smarter Merchant Agreements -- no legal counsel**

90.    CTS did not have advice from legal counsel on any of the agreements involving Smarter Merchant.

**Bizfi Agreement – July 7, 2014**

91.    CTS entered into an agreement and transaction with Defendant Bizfi on July 7, 2014, which purported to be a cash advance for purchase of CTS' credit card receivables or proceeds from future sales by CTS, wherein Bizfi transferred $250,500 to CTS in exchange for CTS' agreement to pay $1,293 via ACH transfer from its bank account on every business day until $325,650 was paid by CTS.  *See* Exhibit J.

92.     Mr. Madachik guaranteed the July 7, 2014 Bizfi loan.  *See* Exhibit J.

93.     The July 7, 2014 agreement at Section 4.3 purports to grant Bizfi power of attorney, but such document does not meet the Ohio requirement for execution of a power of attorney, which requires acknowledgment by a notary.  *See* Exhibit J; see also O.R.C. § 1337.25.

94.     The July 7, 2014 agreement also provided that CTS would pay a $500 processing fee upon signing of the agreement.  *See* Additional Terms of Agreement at Section 1.8 attached hereto as Exhibit J.

95.     CTS made its final payment on the $325,650 on or around April 7, 2015.  *See* Exhibit K.

96.     Between July 7, 2014 and April 7, 2015, the effective rate of interest paid by CTS to Bizfi related to the July 7, 2014 loan was 30 percent over a period of nine months, or effectively 40 percent annually.

**Bizfi Agreement – April 7, 2015**

97.     CTS entered into an agreement and transaction with Defendant Bizfi on April 7, 2015, which purported to be a cash advance for purchase of CTS' credit card receivables or proceeds from future sales by CTS, wherein Bizfi transferred $180,500 to CTS in exchange for CTS' agreement to pay $967 via ACH transfer from its bank account on every business day until $243,675 was paid by CTS.  *See* Exhibit L.

98.     Mr. Madachik guaranteed the April 7, 2015 Bizfi loan.  *See* Exhibit L.

99.     Pursuant to the April 7, 2015 agreement, Bizfi withheld $94,203 from the $180,500 borrowed by CTS to repay the July 7, 2014 loan.  *See* Exhibit L.

100.    The April 7, 2015 agreement at Secion 4.3 purports to grant Bizfi power of attorney but such document does not meet the Ohio requirement of signature acknowledgement by a notary. *See* Exhibit L; *see* O.R.C. § 1337.25.

101.    The April 7, 2015 agreement also provided that CTS would pay a $500 processing fee upon signing of the agreement.  *See* Additional Terms of Agreement at Section 1.8 and Letter dated April 7, 2015 attached hereto as Exhibit L.

**Bizfi Agreement – April 29, 2015**

102.    CTS entered into an agreement and transaction with Defendant Bizfi on April 29, 2015, which purported to be a cash advance for purchase of CTS' credit card receivables or proceeds from future sales by CTS, wherein Bizfi transferred $150,500 to CTS in exchange for CTS' agreement to pay $1,191.46 via ACH transfer from its bank account on every business day until $200,165 was paid by CTS.  *See* Exhibit M.

103.    Mr. Madachik guaranteed the April 29, 2015 Bizfi loan.  *See* Exhibit M.

104.    Pursuant to the April 29, 2015 agreement, $72,222 would be withheld from the $150,500 borrowed by CTS to repay the April 7, 2015 loan.  *See* Exhibit M.

105.    The April 29, 2015 agreement at Section 4.3 purports to grant Bizfi power of attorney but such document does not meet the Ohio signature requirement of acknowledgement by a notary.  *See* Exhibit M; see O.R.C. § 1337.25.

106.    The April 29, 2015 agreement also provided that CTS would pay a $500 processing fee upon signing of the agreement.  *See* Additional Terms of Agreement at Section 1.8 and Letter dated April 29, 2015 attached hereto as Exhibit M.

107.    The April 7 and 29, 2015 loans were paid in full on December 15, 2015, making the effective rate of interest on these loans 34 percent for the period 8 months, or 45.322 percent annually.  *See* Exhibit K.

**Bizfi Agreement – December 15, 2015**

108.    CTS entered into an agreement and transaction with Defendant Bizfi on December 15, 2015, which purported to be a cash advance for purchase of CTS' credit card receivables or proceeds from future sales by CTS, wherein Bizfi transferred $240,500 to CTS in exchange for CTS' agreement to pay $1,604 via ACH transfer from its bank account on every business day until $336,700 was paid by CTS.  *See* Exhibit N.

109.    Mr. Madachik guaranteed the December 15, 2015 Bizfi loan.  *See* Exhibit N.

110.    Pursuant to the December 15, 2015 agreement, $13,105.78 would be withheld from the $240,500 "borrowed" by CTS to repay the April 7 and 29, 2015 loans.  *See* Exhibit N.

111.    The December 15, 2015 agreement at Section 4.3 purports to grant Bizfi power of attorney but such document does not meet the Ohio requirement for signature which requires acknowledgement by a notary.  *See* Exhibit N; O.R.C. § 1337.25.

112.    The December 15, 2015 agreement also provided that CTS would pay a $500 processing fee upon signing of the agreement.  *See* Additional Terms of Agreement at Section 1.8 and Letter dated December 15, 2015.  *See* Exhibit N.

113.    An email dated December 15, 2015 from Kristopher Sweed, a representative of Bizfi, specifically refers to the December 15, 2015 transaction as a loan.  *See* Exhibit O.

114.    The December 15, 2015 loan was paid in full on June 14, 2016, making the effective rate of interest on this loan 40 percent for a term of six months, or 80 percent annually.  *See* Exhibit K.

**Bizfi Agreement – June 14, 2016**

115.    CTS entered into an agreement and transaction with Defendant Bizfi on June 14, 2016, which purported to be a cash advance for purchase of CTS' credit card receivables or proceeds from future sales by CTS, wherein Bizfi transferred $240,000 to CTS in exchange for CTS' agreement to pay $1,900 via ACH transfer from its bank account on every business day until $319,200 was paid by CTS.  *See* Exhibit P.

116.    Mr. Madachik guaranteed the June 14, 2016 Bizfi loan.  *See* Exhibit P.

117.    Pursuant to the June 14, 2015 agreement, $137,437.62 would be withheld from the $240,000 borrowed by CTS to repay the December 15, 2015 loans.  *See* Exhibit P.

118.    The June 14, 2016 agreement at Section 4.3 purports to grant Bizfi power of attorney but such document does not meet the Ohio signature requirement of signature acknowledgment by a notary.  *See* Exhibit P; *see* O.R.C. § 1337.25.

119.    The June 14, 2016 agreement also provided that CTS would pay a $500 processing fee upon signing of the agreement.  *See* Additional Terms of Agreement at Section 1.8 and Letter dated June 14, 2016.  *See* Exhibit P.

120.    If the June 14, 2016 loan was paid in full on June 14, 2017, the effective rate of interest on this loan would be 33 percent annually.

**Bizfi Agreements – no legal counsel**

121.    CTS did not have advice from legal counsel on any of the agreements involving Bizfi.

**Pearl Beta Agreement –July 31, 2015**

122.    CTS entered into an agreement and transaction with Defendant Pearl Beta on July 31, 2015, which purported to be a cash advance for purchase of CTS' credit card receivables or

proceeds from future sales by CTS, wherein Pearl Beta transferred $55,559 to CTS in exchange for CTS' agreement to pay $599 via ACH transfer from its bank account on every business day until $76,671 was paid by CTS.  *See* Exhibit Q.

123.    Mr. Madachik guaranteed the July 31, 2015 Pearl Beta loan.  *See* Exhibit Q.

124.    The July 31, 2015 agreement at Section 111 purports to grant Pearl Beta power of attorney but such document does not meet the Ohio signature requirement of signature acknowledgment by a notary.  *See* Exhibit Q; *see* O.R.C. § 1337.25.

125.    The July 31, 2015 agreement also provided that CTS would pay a $999 underwriting fee and $1,799 origination fee upon signing of the agreement.  *See* Exhibit Q.

126.    The July 31, 2015 loan was paid in full on February 25, 2016, making the effective rate of interest on this loan 37.9 percent for a period of 7 months, or approximately 65 percent annually.

**Pearl Beta Agreement –February 25, 2016**

127.    CTS entered into an agreement and transaction with Defendant Pearl Beta on February 25, 2016, which purported to be a cash advance for purchase of CTS' credit card receivables or proceeds from future sales by CTS, wherein Pearl Beta transferred $92,051 to CTS in exchange for CTS' agreement to pay $963 via ACH transfer from its bank account on every business day until $125,190 was paid by CTS.  *See* Exhibit R.

128.    Mr. Madachik guaranteed the February 25, 2016 Pearl Beta loan.  *See* Exhibit R.

129.    The February 25, 2016 agreement at Section 1.11 purports to grant Pearl Beta power of attorney but such document does not meet the Ohio signature requirement of signature acknowledgment by a notary.  *See* Exhibit R; *see* O.R.C. § 1337.25.

130.    The February 25, 2016 agreement also provided that CTS would pay a $999 underwriting fee and $999 origination fee upon signing of the agreement.  *See* Exhibit R.

131.    The February 25, 2016 loan was paid in full on or around September 15, 2016, making the effective rate of interest on this loan 36 percent for a period of 7 months, or approximately 62 percent annually.  *See* Exhibit S.

**Pearl Beta Agreements – no legal counsel**

132.    CTS did not have advice from legal counsel on any of the agreements involving Pearl Beta.

### DEFENDANT NEW ERA LENDING

133.    On November 11, 2016, New Era Lending obtained a Judgment by Confession in the State of New York, County of Kings, against CTS, in the amount of $163,512.49, which included $32,317.50 in attorney's fees, and is referred to as case no. 2016-520191.  *See* Exhibit E.

134.    The caption for the Judgment by Confession lists the plaintiff as New Era Lending LLC.  *See* Exhibit E.

135.    Email communications related to New Era Lending transactions, sometimes involved individuals working for Smart Business Funding.  *See* Email from A. Collin, undated and attached hereto as Exhibit T.

136.    Pursuant to the Better Business Bureau listing for Smart Business Funding, an alternate name used by Smart Business Funding is Collins Cash, Inc.  *See* Exhibit B.

137.    The attorney's fees of $32,317.50 sought by New Era Lending and Smart Business Funding related to the Confession of Judgment and awarded are not reasonable.

138.   Each of the loans that are subject to New Era Lending's New York Judgment by Confession is void *ab initio* because they are criminally usurious loans under both Ohio and New York law.

139.   CTS does not transact business within the State of New York.

140.   CTS' communications related to the New Era Lending loans occurred solely within Ohio.

141.   CTS is located in Ohio.

142.   The transaction documents were signed by CTS in Ohio, which is evidenced by the notary stamp on the Affidavit of Confession of Judgment which was executed on September 15, 2016 in Cuyahoga County.

143.   The New Era Lending loan proceeds were paid to CTS in Ohio.

144.   The loan payments were paid from CTS' bank account located in Ohio to an account which may be located outside of Ohio.

145.   All of CTS' assets are located in Ohio.

146.   CTS is not subject to the personal jurisdiction of New York.

147.   The New York Judgment by Confession was never domesticated in Ohio.

148.   The Judgment by Confession is unenforceable in Ohio.

**DEFENDANT DMKA, LLC dba THE SMARTER MERCHANT**

149.   On December 9, 2016, Smarter Merchant obtained a Judgment by Confession in the State of New York, County of Nassau, which was recorded on December 14, 2016, against CTS, in the amount of $80,516.96, referred to as case no. 2016-609753.  *See* Exhibit H.

150.   The caption for the Judgment by Confession lists the plaintiff as DMKA, LLC dba The Smarter Merchant.  *See* Exhibit H.

151.    Each of the loans that are subject to the New York Judgment by Confession is void *ab initio* because they are criminally usurious loans under both Ohio and New York law.

152.    CTS does not transact business within the State of New York.

153.    Most, of CTS' contacts related to the Smarter Merchant loans occurred solely within Ohio.

154.    CTS is located in Ohio.

155.    The transaction documents were signed by CTS in Ohio, which is evidenced by the notary stamp on the Affidavit of Confession of Judgment which was executed on July 14, 2016 in Cuyahoga County.

156.    The Smarter Merchant loan proceeds were paid to CTS in Ohio.

157.    The loan payments were paid from CTS' bank account located in Ohio to an account which may be located outside of Ohio.

158.    All of CTS' assets are located in Ohio.

159.    CTS is not subject to the personal jurisdiction of New York.

160.    The New York Judgment by Confession was never domesticated in Ohio.

161.    The Judgment by Confession is unenforceable in Ohio.

### DEFENDANT MERCHANT CASH AND CAPITAL LLC dba BIZFI FUNDING dba BIZFI

162.    Each of the loans made by Bizfi is void *ab initio* because they are criminally usurious loans under both Ohio and New York law.

163.    CTS does not transact business within the State of New York.

164.    Most, of CTS' contacts related to the Bizfi loans occurred solely within Ohio.

165.    CTS is located in Ohio.

166.    The transaction documents were signed by CTS in Ohio.

167.    The Bizfi loan proceeds were paid to CTS in Ohio.

168.    The loan payments were paid from CTS' bank account located in Ohio to an account which may be located outside of Ohio.

169.    All of CTS' assets are located in Ohio.

170.    CTS is not subject to the personal jurisdiction of New York.

## DEFENDANT PEARL BETA

171.    Each of the loans made by Pearl Beta is void *ab initio* because they are criminally usurious loans under both Ohio and New York law.

172.    CTS does not transact business within the State of New York.

173.    Most, of CTS' contacts related to the Pearl Beta loans occurred solely within Ohio.

174.    CTS is located in Ohio.

175.    The transaction documents were signed by CTS in Ohio.

176.    The Pearl Beta loan proceeds were paid to CTS in Ohio.

177.    The loan payments were paid from CTS' bank account located in Ohio to an account which may be located outside of Ohio.

178.    All of CTS' assets are located in Ohio.

179.    CTS is not subject to the personal jurisdiction of New York.

## DAMAGES

180.    CTS repeats and re-alleges the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

181.    As a direct and proximate and foreseeable cause of Defendants' unlawful actions, the CTS suffered actual damages equal to the total amount paid to the Defendants by CTS:

    a.   Amount paid by CTS to New Era Lending LLC, $209,662.00; criminally usurious interest paid, $67,612.00;

    b.   Amount paid by CTS to The Smarter Merchant, $83,156.25; criminally usurious interest paid, $10,506.25;

    c.   Amount paid by CTS to Bizfi, $810,297.39; criminally usurious interest paid, $153,562.79;

    d.   Amount paid by CTS to Pearl Beta Funding, $199,042.00; criminally usurious interest paid, $55,254.00.

182.    As a direct and proximate and foreseeable cause of Defendants' unlawful actions, CTS was unable to pay certain other obligations resulting in the following:

    a.   In 2014, Plaintiff Madachik removed $277,000 from personal savings, using it to re-pay Defendants' merchant loans;

    b.   In 2015, Plaintiff Madachik removed $70,000 from personal savings, using it to re-pay Defendants' merchant loans;

    c.   In 2016, Plaintiff Madachik took a loan against life insurance of $77,500, using it to re-pay Defendants' merchant loans;

    d.   Plaintiff Madachik was unable to pay life insurance premium, because of Defendants merchant loans, resulting in the loss of a $2.4 million life insurance policy;

    e.   In 2017, Plaintiff removed $20,585 from personal savings, using it to re-pay Defendants' merchant loans; and

    f.   CTS sold two cars, obtaining proceeds of $34,000, to pay Defendants merchant loans.

183.     As a direct and proximate and foreseeable cause of Defendants' unlawful actions, CTS lost the ability to accept credit card payments from customers for several months after account was frozen by Defendants, which resulted in lost profits.

184.     Bankers Network and Kristopher Sweed are both jointly and severally liable with each of the following Defendants:  New Era Lending; Collins Cash; Smart Business Funding; and Pearl Beta.

185.     As a direct and proximate and foreseeable cause of Defendants' unlawful actions, Mr. Madachik suffered mental anguish and severe emotional distress at an amount to be determined at trial.

186.     As a direct and proximate and foreseeable cause of Defendants' unlawful actions, CTS has suffered loss of goodwill and loss of business opportunities in an amount to be determined at trial.

187.     As a direct and proximate and foreseeable cause of Defendants' unlawful actions, CTS has suffered from the devaluation of its business in an amount to be determined at trial.

### FIRST CAUSE OF ACTION
### Fraud and Fraud in the Inducement

188.     CTS repeats and re-alleges the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

189.     Defendants committed common law fraud.

190.     Defendants fraudulently induced CTS to enter into transactions by misrepresenting the true nature of the transactions.

191.     At all relevant times, CTS sought a loan, communicated to Defendants that it sought a loan, and believed it was getting a loan.

192.    Documents provided by the Defendants describe a transaction involving the sale of future receivables, while at the same time using terminology that is specifically related to loan transactions.

193.    Defendants' representatives referred to the transactions as loans with banks, however the documents do not refer to the transactions as loans and the lenders are not banks.  *See* Exhibits U, V, W, X, Y.

194.    New Era Lending's name alone suggests that any transaction involving it is a loan.

195.    Bankers Network Services' name suggests that it's services involve banks, when in reality, the entities that Bankers Network Services represented as broker or agent to CTS were not banks.  *See* Exhibits T, V, X, Y.

196.    Defendants Bankers Network Services, LLC and Kristopher Sweed falsely, with knowledge of such falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, represented to the CTS specifically through electronic mail communications that Defendants Pearl Beta Funding and New Era Lending are banks, which they are not, and referred to CTS' transactions with such Defendants as loans, which is contrary to what was described within the documents from these Defendants; all such communication were material to the transactions at hand.  *See* Exhibits T, U, V, W, X, Y.

197.    In an email dated May 11, 2016, Kristopher Sweed referred to New Era Lending dba Smart Business Funding as a bank.  *See* Exhibit T.

198.    In an email dated May 15, 2016, Kristopher Sweed referred to New Era Lending dba Smart Business Funding as a bank.  *See* Exhibit Y.

199.    In an email dated July 8, 2016, Kristopher Sweed referred to entities that it had referred to CTS as banks offering loans.  *See* Exhibit X.

26

200.    In an email dated August 19, 2016, Kristopher Sweed referred to Pearl Beta as providing a loan.  *See* Exhibit U.

201.    In an email dated October 20, 2016, Kristopher Sweed referred to an entity that it had referred to CTS as a bank.  *See* Exhibit V.

202.    All Defendants, except Bankers Network Services, LLC and Kristopher Sweed, falsely, with knowledge of such falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, represented to the public at large and to CTS specifically through their websites that the Defendants provided loans, which was material to the transaction at hand.

203.    Specifically, Defendant New Era Lending's website provides:

a.  That New Era Lending is a direct lender, *see* Exhibit Z;

b.  That New Era Lending is a private lender whose transactions can be summarized as a "partnership for the duration of the loan; we are not a broker, we stand behind every loan from start to finish."  *See* Exhibit AA;

c.  That New Era provides access to top lenders, *see* Exhibit CC;

d.  That merchant cash advances are "alternative lending" with "fixed, daily payments", *see* Exhibit BB;

e.  A testimonial stating that New Era Lending's "staff made the loan process as simple as possible" and were "very efficient with processing the loan and depositing the funds".  *See* Exhibit DD;

f.  A testimonial stating that New Era Lending provides financing, *see* Exhibit EE;

g.  A testimonial stating that New Era Lending provides loan programs, *see* Exhibit FF;

h.  A testimonial stating that New Era Lending provided a working capital loan, *see* Exhibit GG; and

i.  A testimonial stating that New Era Lending provided servicing of a loan, *see* Exhibit HH.

204.  Specifically, Defendant Smart Business Funding's website provides:

a.  Specific marketing focused on Ohio residents, describing its business as providing "small business loan[s]", *see* Exhibit II;

b.  A testimonial about Smart Business Funding providing that it applies competition rates and has a simple application process (a sale would not require an application), *see* Exhibit JJ;

c.  A process described on the website is compared with credit offered by banks and never mentions a sale, *see* Exhibit KK ("While most banks are denying credit to small businesses, we believe in supporting your business[.]");

205.  Specifically, Defendant BizFi's website provides:

a.  When "Products" is clicked on (the first tab on menu bar of the website), a large headline provides you with "The Right Business Loan for You", then describes several loan options, *see* Exhibit LL;

b.  A description of "Invoice Financing" under the heading "The Right Business Loan for You"; in this section, a sale of receivables is not described; borrowing based on future receivables with re-payment is described – which is a loan, *see* Exhibit MM;

206.    Specifically, Defendant The Smarter Merchant's website provides multiple references to funding without any references to purchasing future receivables.  *See* Exhibit OO.

207.    Specifically, Defendant Pearl Beta's website provides explanation of how Pearl finances businesses and provides funding to entities that are "underbanked".  *See* Exhibit PP.

208.    Defendants falsely, with knowledge of such falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, actively solicited transactions from CTS, via website, electronic mail, and telephone discussions, by affirmatively representing that they were providing loans in the form of money provided that would be repaid by CTS, all of which were material to the transaction at hand.

209.    Defendants falsely, with knowledge of such falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, represented in each agreement the market value of the future receivables that Defendants falsely purported to purchase, which were material elements of the transaction at hand.

210.    The Defendants' falsely, with knowledge of such falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, stated in each agreement the value of receivables which was not based on any market value assessment, and was material to the transaction at hand.

211.    The Defendants' falsely, with knowledge of such falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, stated in each agreement that the value of receivables was a particular amount despite knowing that each such representation was a false representation made by Defendants to disguise the true nature of the transaction, which was material to the transaction at hand.

212.    Defendants falsely, with knowledge of such falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, knowingly misrepresented in each agreement, in court filings, and in discussions with CTS the nature of interest and fees charged in connection with the loans, which was material to the transaction at hand.

213.    Defendants falsely, with knowledge of such falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, knowingly misrepresented that fees charged were reasonable costs of servicing the loan, which was material to the transaction at hand.

214.    At the time that representations set forth in this Complaint were made, Defendants knew the representations were false because Defendants knew that the Defendants' intent was to earn huge fees from desperate borrowers while at the same time avoiding usury laws, which was material to the transaction at hand.

215.    Defendants made these representations with the intent to deceive CTS and the public at large, because Defendants knew that the Defendants' intent was to earn huge fees from desperate borrowers while at the same time avoiding usury laws, which was material to the transaction at hand.

216.    Defendants made these representations with the intent to avoid criminal usury laws, which were material to the transaction at hand.

217.    CTS reasonably relied upon all of the knowingly false representations, omissions, and concealments of Defendants set forth herein to CTS' detriment.

218.    CTS' justifiable reliance on Defendants' false representations, omissions, and concealments, resulted in injury to CTS proximately caused by CTS' reliance.

219. CTS was induced by Defendants to enter into agreements through Defendants' fraud or misrepresentation, material to the agreements, related to whether the agreements involved a loan or a sale of future receivables.

220. CTS has been damaged.

221. Actual damages accrued by CTS are in excess of $1,302,157.64.

**SECOND CAUSE OF ACTION**

**Violated Ohio Revised Code §§ 2905.21-.22 and
New York Consolidated Laws, Penal Law § 190.42 – Criminal Usury**

222. CTS repeats and re-alleges the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

223. ORC § 2905.22(A)(2) provides that "No person shall . . . [k]nowingly engage in criminal usury[.]"

224. ORC § 2905.22(A)(3) provides that "[n]o person shall . . . [p]ossess any writing, paper, instrument, or article used to record criminally usurious transactions, knowing that the contents record a criminally usurious transaction.

225. ORC § 2905.21(H) provides that criminal usury "means illegally charging, taking, or receiving any money or other property as interest on an extension of credit at a rate exceeding twenty-five per cent per annum or the equivalent rate for a longer or shorter period" unless the rate of interest is authorized by law or the parties are members of the same immediate family.

226. Defendants are persons pursuant to ORC 1.59(C) which defines person as including "an individual, corporation, business trust, estate, trust, partnership, and association."

227. N.Y. PEN § 190.40 provides that "A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or

receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum[.]"

228.    Defendants knowingly engaged in criminal usury by:  (a) charging, taking and receiving money related to repayment of funds extended by Defendants, in excess of twenty-five percent (25%) per annum; and (b) possessing writings, papers, instruments, or articles used to record criminally usurious transactions.

229.    Defendants' criminal usurious agreements are evidenced in written documents providing for cash extensions by the Defendants to CTS, in exchange for CTS re-paying such funds plus fees in excess of 25% per annum.

230.    Defendants' charging of fees in excess of twenty-five percent (25%) per annum in a written document is *per se* criminally usurious.

231.    The Defendants' agreements are illegal, void, and unenforceable.

232.    CTS was damaged by the illegal, void, and unenforceable agreements.

### THIRD CAUSE OF ACTION

### 28 U.S.C. § 2201(a) - Declaratory Judgment / Usury

233.    CTS repeats and re-alleges the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

234.    Each of the agreements among CTS and the Defendants sets forth a loan transaction to which Ohio and/or New York usury laws are applicable and such laws establish any corporate interest rate in excess of 25% as usurious.

235.    Each of the loans charges a criminally usurious interest rate in excess of 25%.

236.    CTS intended to enter into loan transactions with the Defendants in each of the agreements at issue.

237.    Defendants knowingly charged a criminally usurious rate of interest in excess of 25% on the loans and entered into the loans with usurious intent.

238.    The loans are in writing and are *per se* usurious.

239.    CTS seeks a declaratory judgment that the loans are void *ab initio* as criminally usurious.

240.    CTS seeks a declaratory judgment precluding Defendants from recovering any remaining installments due under the loans.

241.    CTS seeks a declaratory judgment ordering Defendants to repay to CTS all payments made to date.

242.    CTS seeks a declaratory judgment that the Confessions of Judgment that CTS was forced to execute in connection with each illegal loan is null, void and unenforceable.

## FOURTH CAUSE OF ACTION

### Pled in the alternative, Breach of Contract

243.    CTS repeats and re-alleges the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

244.    If the Court determines that valid contracts exist, then Defendants breached such contracts by failing to perform the portion of the contract requiring defendants to take ownership of future receivables.

245.    If the Court determines that valid contracts exist, then Defendants breached such contracts by including criminally usurious fees and interest within the contracts, without legal excuse.

246.    CTS performed its contractual obligations by making payments toward the borrowed amount and paying interest and fee amounts.

247. CTS was injured by Defendants contract breaches and accrued damages in excess of $1,302,157.64.

### FIFTH CAUSE OF ACTION

**ORC 4165 - Deceptive Trade Practices;**
**ORC 1321.36, .41 – Short-term Lenders**
<u>**ORC 1345.02 - Unfair or Deceptive Acts or Practices**</u>

248. CTS repeats and re-alleges the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

249. Pursuant to ORC § 4165.02, the Defendants engaged in a deceptive trade practice, by using deceptive representations in connection with goods or services Defendants provided.

250. Specifically, the Defendants' advertising, including representations on their websites, suggest that the Defendants provide loans, but the documents provided to borrowers, including CTS, instead represent the transactions as sales of future receivables in an effort to avoid usury laws, in violation of ORC § 4165.02(A)(4).

251. Defendants are not licensed or registered to do business in the State of Ohio.

252. Defendants Smarter Merchant and Bizfi operate under fictitious names that have not been registered in the State of Ohio, which violates ORC § 4165.02(A)(5)(a).

253. ORC 1345.02 provides that no supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction.

254. When the Defendants asked Mr. Madachik to sign a personal guaranty, they entered into a consumer transaction.

255. During each consumer transaction, the Defendants deceived Mr. Madachik by misrepresenting the particular style of transaction, pursuant to ORC §§ 1345.02(B)(2), and (B)(5),

by advertising, including on their websites, that they provided loans, but in the paperwork finalizing the transaction, represented the transaction as a sale of future receivables.

256.    Pursuant to ORC § 1345.02(G), the Defendants participated in an unfair or deceptive act or practice by failing to obtain or maintain a license to provide loans as required by state law in Ohio.  Lenders and brokers that are not governed by banking regulations, must obtain an Ohio license before providing loans to borrowers in Ohio.  *See* ORC § 1321.36(A).  Ohio law prohibits people or entities located outside of Ohio from making loans to Ohio borrowers via telephone, mail, or internet.  *See* ORC § 1321.36(B).  Ohio Revised Code section 1321.41 lists prohibited actions by short-term lenders, which includes a prohibition against making a short-term loan to a borrower for the purpose of retiring another short-term loan.  *See* ORC § 1321.41(G).

257.    CTS was damaged and Defendants were the cause and proximate cause of such damage.

**SIXTH CAUSE OF ACTION**

**Pled in the alternative, N.Y. General Business Law § 349**

258.    CTS repeats and re-alleges the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

259.    Pursuant to New York General Business Law § 349, "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

260.    The Defendants deceived Plaintiffs through electronic and/or oral communications by misrepresenting the particular style of transaction and by advertising, including on their websites, that they provided loans, but in the paperwork finalizing the transaction, represented the transaction as a sale of future receivables.

261.    The Defendants willfully and knowingly misrepresented the style of the money transaction.

262.    CTS was damaged and Defendants were the cause and proximate cause of such damage.

### SEVENTH CAUSE OF ACTION

### 18 U.S.C. §§ 1962(b), 1964 Racketeer Influenced and Corrupt Organizations Act, as to all Corporate Defendants / Mail and Wire Fraud

263.    CTS repeats and re-alleges the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

264.    Defendants, acquired or maintained, through a pattern of racketeering activity or the collection of an unlawful debt, an interest in or control of an enterprise engaged in, or the activities of which affect, interstate or foreign commerce.

265.    Defendants operated, maintained an interest in, and controlled an enterprise which collected unlawful debt based on usurious interest rates and fees.

266.    Defendants operated across state lines.

267.    Defendants conducted multiple acts of mail and wire fraud.

268.    The Defendants operated a scheme to defraud by misrepresenting through advertising, including on their websites and electronic and oral communication that they provided loans, when documents provide that in fact each transaction was a sale of future receivables.

269.    The Defendants operated a scheme to defraud by misrepresenting through documents that each transaction was a sale of future receivables, when Defendants never actually took possession or ownership of any future receivables.

270.    The Defendants operated a scheme to defraud by misrepresenting through documents that each transaction was a sale of future receivables which would have been a non-

recourse transaction, but instead required personal guaranties, thereby maintaining within the transaction recourse.

271.   Defendants used mails or electronic mails, telephone and facsimile communications in furtherance of their scheme.

272.   Plaintiffs incurred injury to their business due to Defendants' violation of section 1962.

WHEREFORE, CTS seeks an order from this Court:

a)   Declaring and ordering that the Defendants' agreements are illegal, void, and unenforceable because such agreements charged criminally usurious interest rates in excess of 25%;

b)   Declaring and ordering that the attorney's fees sought by and awarded to New Era Lending via Confession of Judgment are not reasonable, are illegal, and are unenforceable.

c)   Ordering that all restraining notices, liens, garnishments, levies, and other enforcement mechanisms in connection with the Defendants' agreements are illegal, unenforceable, and vacated;

d)   Ordering that any Judgment by Confession obtained by Defendants are illegal and unenforceable against Plaintiffs on the basis of lack of personal jurisdiction and violation of Ohio law;

e)   Ordering Defendants to re-pay to CTS all amounts previously paid to Defendants in connection with the criminally usurious and fraudulently obtained loans;

f)   Granting an injunction restraining Defendants from enforcing any rights under the criminally usurious, illegal, and fraudulently obtained loans;

g) Awarding CTS actual damages:

    i.   Jointly and severally against New Era Lending, Bankers Network Services, and Kristopher Sweed in the amount of $209,662.00;

    ii.   Against The Smarter Merchant in the amount of $83,156.25;

    iii.   Against Bizfi in the amount of $810,297.39;

    iv.   Jointly and severally against Pearl Beta Funding, Bankers Network Services, and Kristopher Sweed in the amount of $199,042.00;

h) Awarding CTS damages for the loss of business profits and loss of life insurance policy in the amount of $3 million;

i) Awarding CTS consequential damages in the amount of $1 million;

j) Awarding CTS punitive damages in an amount to be determined at trial;

k) Awarding CTS its costs and reasonable attorney fees incurred in this action;

l) Awarding CTS prejudgment and postjudgment interest;

m) Ordering Defendants to pay $1,000 for each deception.

n) Granting such other and further relief as this Court deems just and proper.


Dated: June 22, 2017               Respectfully submitted,

                                  */s/ Sherri L. Dahl*
                                  Sherri L. Dahl (0073621)
                                  DAHL LAW LLC
                                  12415 Coit Road
                                  Bratenahl, Ohio 44108
                                  SDahl@DahlLawLLC.com
                                  Tel: 216.235.6871
                                  Fax: 216.373.6963
                                  COUNSEL FOR PLAINTIFFS